IN THE UNITED STATES DISTRICT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

CHRISTOPHER VANNES,      :
      :
   Plaintiff,      :
      :   No. 3:14-CV-9 (CAR)
v.      :
      :
WOODROW SMITH, JR., individually :
and d/b/a SMITH'S TRUCKING, and  :
NATIONAL CASUALTY COMPANY, :
      :
   Defendants.      :

## ORDER ON PRE-TRIAL MOTIONS

Plaintiff brings this case to recover for personal injuries he suffered after a motor vehicle collision with Defendant Woodrow Smith's tractor trailer. Currently before the Court are Defendants' Motion to Exclude Certain Opinions of Plaintiff's Expert Jeffrey Kidd [Doc. 52]; Plaintiff's Motion to Strike Defendants' Reply Brief [Doc. 67] in support of their Motion to Exclude; Defendants' Motion *In Limine* to Exclude Certain Testimony of Witness Freddie Grigg [Doc. 63]; and Defendants' Motions for Partial Summary Judgment as to Plaintiff's Claims for Punitive Damages and Attorneys' Fees [Docs. 36 and 39]. As explained below, Defendants' Motions to Exclude Plaintiff's Expert, Plaintiff's Motion to Strike Defendants' Reply Brief,[1] and Defendants' Motion *In Limine*

---

[1] In ruling on all of the Motions in this case, including the Motion to Exclude the Expert Opinion of Jeffrey Kidd, this Court evaluated the entire record in this case, including all arguments raised in the briefs and

to Exclude Certain Testimony of Freddie Griggs [Docs. 52, 67, and 63] are **DENIED.** Defendants' Motions for Partial Summary Judgment as to Plaintiff's Claims for Punitive Damages and Attorneys' Fees [Docs. 36 and 39] are **GRANTED**.

## GENERAL BACKGROUND

On October 23, 2012, at approximately 10:48pm in Franklin County, Georgia, Plaintiff Christopher Vannes, driving northbound on I-85 in a 1995 GMC Sonoma pickup truck, crashed into the back of Defendant Woodrow Smith's flatbed tractor-trailer while travelling in the right-hand lane. Plaintiff contends Defendant Smith negligently entered the interstate with a flat tire, below the posted speed limit, into the path of Plaintiff's pickup truck, without having activated the required lights and flashers. Thus, Plaintiff was unable to timely see and react to the tractor trailer to avoid a collision that caused serious injuries to his back, neck, and head, and a broken pelvis, leg, and ankle. Defendants dispute Plaintiff's allegations entirely. Defendants contend Smith, with his lights and flashers activated, was travelling well above the minimum speed limit when Plaintiff, who was speeding, crashed into the back of Smith's trailer.

---

submissions of the parties. If, as Plaintiff contends, Defendants improperly raised any arguments in their reply brief regarding their Motion to Exclude the Expert Opinion of Jeffrey Kidd, the Court finds any such error minor and does not prejudice Plaintiff. Thus, without further discussion, this Court **DENIES** Plaintiff's Motion to Strike Defendants' Reply Brief [Doc. 67].

The record, in pertinent part, contains deposition testimony from Defendant Smith, Plaintiff, two other drivers who were travelling in their tractor-trailers on the interstate that night and witnessed the accident – Freddie Grigg and Joseph Valentino, and Defendants' and Plaintiff's respective expert witnesses in the field of automobile accident reconstruction. The following testimony is pertinent for the Motions at bar:

Defendant Smith testified the right outside tire of his tractor's #2 axle blew out, and he pulled to the shoulder of I-85.[2] While pulled over, he located a repair shop at the next exit, about one-half mile away, and decided it was safer to drive the short distance to the next exit than remain on the shoulder and wait for roadside assistance.[3] The Federal Motor Carrier Safety Regulations allow a commercial driver to drive a commercial vehicle which has sustained a mechanical defect to the nearest safe location.[4] Smith then drove on the shoulder of the interstate with his four-way flashers activated until he reached 25-30 mph.[5]

Upon reaching 25 to 30 mph, Smith checked his rearview mirror, spoke to a nearby tractor-trailer driver over the CB radio who told him he was clear to enter the right lane, turned off his four-way flashers, activated his left-turn signal, and merged

---

[2] Smith Depo., p. 45 [Doc. 44].
[3] *Id.*
[4] See Griffin Depo., pp. 47-48 [Doc. 36-4].
[5] Smith Depo., pp. 56-57, 59.

into the right lane.[6] He then re-activated his four-way flashers while continuing to accelerate. He reached 50-55 mph when he felt another "pop" and the vehicle "shake." Thinking another tire had blown, Smith pulled onto the shoulder to investigate.[7] As he inspected the vehicle, eyewitness Joseph Valentino pulled in front of Smith's tractor and told him Plaintiff's truck had struck the rear of his trailer.[8] Smith testified the collision occurred less than a quarter of a mile after he pulled back into the roadway; the point of impact was approximately a quarter of a mile from the exit; and after hearing the "pop," he brought his tractor-trailer to a controlled stop in the emergency lane between 25 and 50 yards away from Plaintiff's vehicle.[9]

Plaintiff testified he was driving on I-85 northbound just below 70 mph and maintaining a proper lookout.[10] He passed a slow-moving tractor trailer driven by Joseph Valentino and then shifted into the right lane, planning to take the next exit on his route home.[11] About a mile before the exit, a red dot suddenly appeared ahead of his vehicle.[12] Realizing there was an object in the dark roadway, Plaintiff slammed on his

---

[6] *Id.*

[7] *Id.* at 64-65.

[8] *Id.* at 65.

[9] *Id.* at 63-75.

[10] Plaintiff Depo., p. 102 [Doc. 45].

[11] *Id.* at 103-05.

[12] *Id.* at 107-08.

brakes.[13]  The next thing he remembers is waking up inside his vehicle at the bottom of a steep embankment beside the road.[14]

Eyewitness Freddie Grigg testified he saw the collision from his tractor trailer.[15] Grigg had been following Plaintiff for several minutes and estimated, based on their relative speeds, Plaintiff was travelling at or just above 70 mph, the posted speed limit.[16] Grigg watched Plaintiff pass Valentino's tractor trailer, and as Grigg also shifted his truck into the left lane to pass Valentino's tractor trailer, he saw Plaintiff's vehicle slam into something on the roadway.[17]  Grigg explained he had a clear, unobstructed view of the roadway for several seconds prior to the impact and saw no other vehicles in front of Plaintiff.[18]  He suddenly saw Plaintiff's vehicle lift up into the air and make a sharp right turn off of the road, having no idea what Plaintiff struck.[19] Seconds later, he saw Defendant Smith's tail lights and trailer flashers come on.[20]

Eyewitness Joseph Valentino testified he had been following Defendant Smith for several miles and watched the emergency flashers on Smith's trailer repeatedly

---

[13]  *Id.* at 108.
[14]  *Id.* at 112.
[15]  Grigg Depo., pp. 11-13, 21, 27, 46.
[16]  *Id.* at 31, 35, 41, 75, 96.
[17]  *Id.* at 37-39, 45-46, 101-02.
[18]  *Id.* at 45-47, 51, 156-57.
[19]  *Id.* at 45-47, 49.
[20]  *Id.* at 52-53.

disappear from view over each hillcrest and reappear at the crest of each following hill.[21] Valentino maintains that seconds before the collision, Plaintiff passed his truck in the left lane travelling "at least" 80 mph.[22] Ten seconds after Plaintiff passed him, he saw Plaintiff collide into the rear of Smith's trailer about 800 to 900 feet ahead of him.[23]

Plaintiff's expert, Jeffrey Kidd, opined, in pertinent, part that Defendant Smith was travelling below 30 mph at the moment of impact, and Plaintiff was likely travelling at or around the posted speed limit of 70 mph.[24]

Defendants and Plaintiff appear to agree genuine issues of material fact exist as to liability in this case. In their Motions, Defendants seek (1) summary judgment as to Plaintiff's claims for punitive damages and attorneys' fees; (2) to exclude Mr. Kidd's opinion as to the actual speeds of the two vehicles at the moment of impact; and (3) to exclude Mr. Grigg's testimony Defendant Smith did not have his lights and flashers activated when he re-entered the interstate. The Court addresses each of these Motions below.

## MOTION TO EXCLUDE PLAINTIFF'S EXPERT

---

[21] Valentino Depo., pp. 63-65, 79 [Doc. 43].
[22] Id. 10, 11.
[23] *Id.* at 76-77.
[24] Kidd Depo., p. 103 [Doc. 49].

Plaintiff engaged accident reconstructionist Jeffrey A. Kidd, who provided several expert opinions. In their Motion to Exclude, Defendants challenge only the opinion related to the actual speeds of the two vehicles, arguing it is inadmissible under *Daubert v. Merrell Dow Pharms.*[25] and Federal Rule of Evidence 702 because in order to reach this opinion Mr. Kidd simply "cherry-picks" from conflicting lay witness testimony and uses no scientific methodology; thus his opinion is not reliable and does not assist the trier of fact.

## Legal Standard

Federal Rule of Evidence 702 governs the admissibility of expert testimony, and it states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. [26]

Simply stated, under Rule 702, the trial court can admit relevant expert testimony only if it finds that: (1) the expert is qualified to testify about the matters he intends to address; (2) the methodology used by the expert to reach his conclusions is sufficiently reliable;

---

[25]  509 U.S. 579 (1993).
[26]  Fed. R. Evid. 702.

and (3) the expert's testimony will assist the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or determine a fact in issue.[27]

As the Supreme Court explained in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[28] Rule 702 imposes a duty on trial courts to act as "gatekeepers" to ensure that speculative and unreliable opinions do not reach the jury.[29]   Acting as a gatekeeper, the trial court must make certain that expert witnesses employ in the courtroom the "same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[30]  The court's gatekeeping role is especially significant, since "the expert's opinion can be both powerful and quite misleading because of the difficulty in evaluating it."[31]

To fulfill its role, the trial court must determine whether the expert has the requisite qualifications to offer his or her opinions.[32]   The trial court must also "'conduct an exacting analysis' of the <u>foundations</u> of expert opinions to ensure they meet the

---

[27] *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002) (citing *Maiz v. Virani*, 253 F.3d 641, 664 (11th Cir. 2001)); *J & V Dev., Inc. v. Athens-Clarke Cnty.*, 387 F. Supp. 2d 1214, 1223 (M.D. Ga. 2005).
[28]  509 U.S. 579 (1993).
[29]  *Id.* at 589, n.7; *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1237 (11th Cir. 2005).
[30] *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *see also Goebel v. Denver & Rio Grande W. R.R. Co.*, 346 F.3d 987, 992 (10th Cir. 2003).
[31]  *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting *Daubert*, 509 U.S. at 595) (internal quotations omitted).
[32] *Poulis-Minott v. Smith*, 388 F.3d 354, 359 (1st Cir. 2004); *see also Frazier*, 387 F.3d at 1260.

standards for admissibility under Rule 702."[33]   Finally, the court must ensure the relevancy of expert testimony, meaning that it must determine whether the testimony will assist the trier of fact.[34]

The court performs its gatekeeping role consistent with Rule 104(a), which commits preliminary evidentiary questions to the court's decision and which further empowers courts in answering these questions to rely on evidence without being constrained by the rules of evidence.[35]   In sum, in acting as a gatekeeper, the court must keep "unreliable and irrelevant information from the jury because of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value."[36]  Although *Daubert* involved scientific experts, the Supreme Court has made it clear that the strictures of Rule 702 and *Daubert* apply with equal force to non-scientific expert witnesses.[37]   Also, in all cases the proponent of the expert witness bears the burden of establishing that the expert's testimony satisfies the qualification, reliability, and helpfulness requirements of Rule 702 and *Daubert*.[38]  Finally, "any step that renders

---

[33] *Frazier*, 387 F.3d at 1260 (quoting *McCorvey*, 298 F.3d at 1257) (emphasis in original).

[34] *See Daubert*, 509 U.S. at 591.

[35] *Id.* at 592-93 & n. 10; Fed. R. Evid. 104(a). In particular, Rule 104(a) provides that "[t]he court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so deciding, the court is not bound by evidence rules, except those on privilege." Fed. R. Evid. 104(a).

[36] *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311-12 (11th Cir. 1999).

[37] *See Kumho Tire*, 526 U.S. at 147.

[38] *McClain*, 401 F.3d at 1238 & n. 2; *see also Frazier*, 387 F.3d at 1260.

the analysis unreliable renders the expert's testimony inadmissible."[39]

Beginning with the qualification requirement, the Eleventh Circuit has explained that "experts may be qualified in various ways."[40]   Certainly, an expert's scientific training or education may provide one means by which an expert may qualify to give certain testimony; however, experience in a particular field may also qualify an expert to offer an opinion on a particular matter.[41]   Indeed, "experts come in various shapes and sizes," and, consequently, "there is no mechanical checklist for measuring whether an expert is qualified to offer opinion evidence in a particular field."[42]   In all cases, the court must focus its inquiry on whether the expert has the requisite skill, experience, training, and education to offer the testimony he intends to introduce.[43]

Regarding the reliability requirement, the Eleventh Circuit directs trial courts to assess "whether the reasoning or methodology underlying the testimony is . . . valid and whether that reasoning or methodology properly can be applied to the facts in issue."[44]

---

[39] *Goebel*, 346 F.3d at 992 (quoting *Mitchell v. Gencorp, Inc.*, 165 F.3d 778, 782 (10th Cir. 1999)) (internal alterations omitted).

[40] *Frazier*, 387 F.3d at 1260.

[41] *Id.* at 1260-61.

[42] *Santos v. Posadas de Puerto Rico Assocs. Inc.*, 452 F.3d 59, 63 (1st Cir. 2006).

[43] *Poulis-Minott*, 388 F.3d at 359.

[44] *Frazier*, 387 F.3d at 1262 (quoting *Daubert*, 509 U.S. at 592-93) (internal alterations omitted).

This inquiry must focus "solely on the principles and methodology [of the experts], not on the conclusions that they generate."[45]

*Daubert* offers four non-exclusive factors that courts may consider in evaluating the reliability of an expert's testimony: (1) testability; (2) error rate; (3) peer review and publication; and (4) general acceptance.[46] These four factors most readily apply in cases involving scientific testimony and may offer little help in other cases, particularly those involving non-scientific experts.[47]  Accordingly, these factors merely illustrate rather than exhaust the factors or tests available to the trial court.  The trial court has "considerable leeway" in deciding which tests or factors to use to assess the reliability of an expert's methodology.[48]

The advisory committee's notes for Rule 702 offer an additional list of factors or tests. These tests are:

(1)     Whether the expert is proposing to testify about matters growing naturally and directly out of research he has conducted independent of the litigation, or whether he has developed his opinion expressly for purposes of testifying;

(2)     Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion;

---

[45] *Daubert*, 509 U.S. at 595; *see also Goebel*, 346 F.3d at 992.

[46] 509 U.S. at 593-95; *see also J & V Dev., Inc.*, 387 F. Supp. 2d at 1224.

[47] *See Kumho Tire*, 526 U.S. at 150-52.

[48] *Id.* at 151-52.

11

(3)   Whether the expert has adequately accounted for obvious alternative explanations;

(4)   Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting;

(5)   Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.[49]

Like the four *Daubert* factors, these factors do not comprise a definitive checklist, nor is any single factor dispositive of reliability; instead, the tests articulated in the advisory committee's notes merely illustrate the issues a court may consider in evaluating an expert's testimony.[50]

Finally, for admission, the expert testimony must assist the trier of fact. Expert testimony assists the trier of fact "if it concerns matters that are beyond the understanding of the average lay person."[51] "[E]xpert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments."[52] Nor does expert testimony help the trier of fact if it fails to "fit" with the facts of the case.[53] Expert testimony lacks "fit" when "a large analytical leap must be made between the facts and the opinion."[54] "A court may conclude that there is

---

[49] Fed. R. Evid. 702 advisory committee's note (2000 amendments).

[50] *See id.*

[51] *Frazier*, 387 F.3d at 1262.

[52] *Id.* at 1262-63.

[53] *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004).

[54] *Id.*; *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

simply too great an analytical gap between the data and the opinion proffered."[55]   Thus, the court may exclude otherwise reliable testimony if it does not have "sufficient bearing on the issue at hand to warrant a determination that it [is 'helpful' to the trier of fact]."[56] At all times when scrutinizing the reliability and relevance of expert testimony, a court must remain mindful of the delicate balance between its role as a gatekeeper and the jury's role as the ultimate fact-finder.   A district court's "gatekeeper role . . . is not intended to supplant the adversary system or the role of the jury."[57]   "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[58]   A court may not "evaluate the credibility of opposing experts" or the "persuasiveness of competing scientific studies;"[59] instead, its duty is limited to "ensur[ing] that the fact-finder weighs only sound and reliable evidence."[60]

---

[55] *General Electric*, 522 U.S. at 146.
[56] *Bitler v. A.O. Smith Corp.*, 391 F.3d 1114, 1121 (10th Cir. 2004).
[57] *Allison*, 184 F.3d at 1311.
[58] *Daubert*, 509 U.S. at 596.
[59] *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK, Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).
[60] *Frazier*, 387 F.3d at 1272.

## Mr. Kidd's Qualifications and Opinions

Jeffrey Kidd began his career with the Georgia State Patrol (GSP) in 1988, retiring in 2009 after over 20 years of service.[61]  Kidd then became a charter member of the GSP's Specialized Collision Reconstruction Team and served as team leader in Valdosta and Gainesville. During his tenure with GSP, Kidd was involved in the investigation and reconstruction of more than 3,000 vehicle collisions. Kidd is certified by the Accreditation Commission for Traffic Accidence Reconstruction and the Federal Motor Carrier Safety Administration to conduct Level I, II, and III investigations. He is a member of the Society of Automotive Engineers, the National Association of Professional Accident Reconstruction Specialists, and the Georgia Motor Trucking Association, among other professional organizations. Since 2005, Kidd has been the president and owner of Collision Specialists, Inc. (CSI), a private accident reconstruction firm. Kidd is also an instructor in Georgia and Florida and has taught more than 1,400 courses in the field of accident reconstruction and has assisted in the design of curriculums on accident reconstruction for the GSP. Defendants do not contest Kidd's qualifications to give expert opinions in this case.

---

[61]  Kidd Rule 26 Report and Curriculum Vitae [Doc. 58-1].

To reach his opinions in this case, Kidd reviewed his entire case file, which included the Georgia State Patrol crash report; photographs of the accident scene and vehicles; all 911 calls; the Motor Carrier Compliance Division inspection report; the depositions and exhibits of Freddie Grigg, Joseph Valentino, Plaintiff, and Defendant Smith; all recorded statements; all vehicle and trailer repair records from before and after the collision; Vinlink and AutoStat information on the vehicles; the Federal Motor Carrier Safety Regulation; and relevant pleadings and discovery.[62] In addition, CSI inspected, photographed, and measured, using a "Faro laser scanner," the dimensions and crush damages to Plaintiff's vehicle.[63] Together with all other evidence, Kidd used the crush data and measurements to perform a variety of speed, time, and distance calculations regarding the collision.

Based on the evidence, his review of the crush damage, his education, experience, and training, and his speed, time, and distance calculations, Kidd reached a variety of conclusions and opinions about the accident. First, Mr. Kidd opined Defendant Smith's tractor trailer violated the Federal Motor Carrier Regulations in the following ways: (1) the trailer was missing requisite "inverted L" retro-reflective tape on the tip of the rear-racing corners of the trailer; (2) portions of the trailer's rear retro-reflective tape

---

[62] Kidd Depo., p. 9-20, 34 [Doc. 49].
[63] *Id.* at pp. 20-22, 39-45.

were incomplete, improperly obscured, and in poor condition; and (3) Smith was operating the tractor trailer without a tire or with remnants of a blown tire. Defendants do not challenge the admissibility of these opinions.

Kidd also reached opinions regarding the speeds of the vehicles in the collision. Kidd calculated the equivalent barrier speed (EBS) of the impact. In calculating the EBS, Kidd measured the speed loss of Plaintiff's vehicle in the impact, or, stated differently, the difference in speed between Plaintiff and Defendant Smith at impact. He calculated Plaintiff's vehicle experienced a 41-43 mph speed loss, or in other words, Plaintiff was travelling 41-43 mph faster than Smith at impact. Kidd also calculated Plaintiff's minimum speed at impact using Plaintiff's pre-impact speed loss caused by his application of brakes for 69 feet of skid, and post-impact speed loss during 40 feet of post-impact speed travel. Combining the pre- and post-impact speed loss calculations with his EBS calculations, he determined Plaintiff's vehicle was travelling a minimum of 63.94 mph at impact. Defendants also do not challenge the admissibility of these opinions.

Additionally, Kidd calculated Defendant Smith's maximum speed at impact. Kidd reviewed Smith's deposition wherein he testified after the collision, he brought his tractor trailer to a controlled stop and came to a stop 25 to 50 yards—150 to 300

feet—from the final resting place of Plaintiff's vehicle. Based on Smith's testimony he came to a "controlled stop," Kidd assigned values for Smith's perception and time and the truck's mechanical lag time related to driver application of the brakes. Using these values, Kidd calculated at 30 mph Smith would have needed 188 feet to bring his tractor trailer to a stop, at 35 mph he would have needed 238 feet, at 55 mph he would have needed 500 feet, and so on.

Kidd then looked at his calculations regarding Plaintiff's minimum speed. Kidd explained in calculating Plaintiff's 63.94 mph minimum speed, he assumed Plaintiff continued to apply his brakes post-impact; however, based on his education and experience, together with crush data on the front axle of Plaintiff's truck, he finds it unrealistic Plaintiff actually applied the brakes after the collision.[64] Thus, Kidd explained Plaintiff would have in fact been travelling faster than Kidd's 63.94 minimum speed calculation. Using all of this data together, Kidd opined Defendant Smith was traveling below 30 miles an hour, and Plaintiff was traveling at or near the posted speed limit of 70 mph at the point of impact.[65] Defendants challenge the admissibility of this opinion.

---

[64] *Id.* at 132-33.
[65] *Id.* at 103.

## Analysis

Defendants argue Mr. Kidd's opinion regarding the actual speeds of the two vehicles rests solely upon Mr. Kidd's "cherry-picking" of lay witness testimony and not any scientific method. The Court disagrees. As explained below, Defendants' objections ultimately attack the data upon which Mr. Kidd relies to reach his conclusion, not the accuracy of the formula he uses to reach it. Thus, Defendants must explore the precision of Mr. Kidd's data and how useful it may be to the jury on cross-examination.

In addition to his unchallenged calculations resulting in his opinions Plaintiff was travelling at a minimum speed of 63.94 mph and 41-43 mph faster than Defendant Smith at impact, Mr. Kidd considered several other variables to formulate his opinion regarding the speeds of the two vehicles at impact, including: (1) the distance between the back of Defendant Smith's trailer and the final resting place of Plaintiff's truck after the crash; (2) Defendant Smith's perception and reaction times to bring his tractor trailer to a stop after the collision; (3) the mechanical lag time of the tractor trailer; and (4) the degree of Plaintiff's brake-application before the crash. Applying all of these variables to an unchallenged formula, Kidd calculated Defendant was travelling between 25 and 30 mph at the moment of impact, and thus, based on the accident's EBS of 41 to 43 mph, Plaintiff was travelling at or near the posted speed limit of 70 mph.

Defendants do not dispute the accuracy of the formula Mr. Kidd uses. Instead, Defendants object to the values Kidd uses for the formula's variables, arguing they are simply "cherry picked" from witness testimony. Defendants' challenges, however, go to the weight of Kidd's opinion, not its admissibility. In *Quiet Technology*, the Eleventh Circuit explained where a party disputes the data underlying an otherwise valid formula, a *Daubert* challenge to the opinion itself is not appropriate.[66] Instead, "[t]he identification of such flaws in generally reliable scientific evidence is the role of cross-examination."[67] That is the case here. Kidd used Defendant Smith's testimony to assign values to the variables in the formula. Defendants object to this underlying data, not the formula. Thus, Defendants must attack that data on cross-examination.

Kidd acknowledges his opinion is consistent with eyewitness Freddie Grigg's testimony Plaintiff was travelling between 65 to 70 mph and inconsistent with eyewitness Joseph Valentino's testimony Plaintiff was travelling 80 mph. Kidd, however, discounted Valentino's estimate of Plaintiff's speed after Kidd performed calculations using Valentino's testimony that (1) there was a 10-second time period between the time Plaintiff's vehicle passed his tractor-trailer until the collision; and (2) the collision occurred 800 to 900 feet in front of Valentino's vehicle. Using Valentino's

---

[66] *Id.*

[67] *Id.*

estimates, Kidd calculated Plaintiff would have been travelling 125 miles per hour, which did not comport with his own data or calculations, or any other evidence in the record he reviewed.

Defendants' argument that Kidd usurps the weighing of eyewitness testimony from the jury is unpersuasive. On the contrary, Kidd acknowledges his formulations are only as good as the data upon which they are based. He sets forth the reasons he uses such data but explains how his formulations work with alternative data. For example, Kidd acknowledges if the jury believes Valentino's testimony, the jury could use his formulas and find Plaintiff was travelling well above 80 miles per hour. Moreover, Kidd admits his calculations would change if the jury does not believe Defendant Smith's testimony he used a controlled-breaking maneuver post-impact, and/or he came to a stop 25 to 50 yards from Plaintiff's truck's final resting place. Defendants' objections go to the weight of Kidd's opinion, not the reliability of his method.[68] The Court finds Kidd's opinion as to the actual speeds of the two vehicles at impact is sufficiently reliable to be weighed by the jury, and Defendants can attack its veracity through cross-examination.

---

[68] *See Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Litd.*, 326 F.3d 133, 1345 (11th Cir. 2003).

In considering whether Kidd's opinion assists the jury, the Court must determine whether it offers something "beyond the understanding and experience of the average citizen."[69] Kidd's testimony, which this Court has already found to be sufficiently reliable, relates to the cause of this accident and will assist the jury in making such a determination. Thus, the Court finds it to be admissible.

## MOTION *IN LIMINE* TO EXCLUDE FREDDIE GRIGG'S TESTIMONY

Defendant Woodrow Smith also seeks to exclude as pure speculation eyewitness Freddie Grigg's testimony the lights and flashers on Defendant Smith's trailer were not active before the collision.[70] The Court disagrees and finds it is proper lay witness testimony to be challenged through cross examination and then evaluated by the jury.

On the night of the accident, Freddie Grigg testified the "road was empty in front of [him]," and he saw no other vehicles for "a long, long ways," "might be a mile," when, at the bottom of a hill, he suddenly saw Plaintiff's vehicle lift up off of the road, make a right-hand turn, and go out through woods.[71] "At the time of the accident, I had a direct view looking. I was looking dead at [Plaintiff's vehicle] when he hit [Defendant Smith's]

---

[69] *United States v. Rouco*, 765 F.2d 983, 995 (11th Cir. 1985).

[70] The Court notes that Defendant also stated in his Motion that the Court must exclude Grigg's testimony that Smith pulled his vehicle from the shoulder in front of Plaintiff's vehicle before the collision. However, neither Defendant nor Plaintiff substantively addresses this testimony at all. Thus, the Court does not have enough information at this time to make a ruling.

[71] *Id.* at pp. 45-47.

18 wheeler."[72]  Grigg emphasized throughout his deposition nothing blocked his view of

the accident.[73]  Indeed, Grigg stated he had an uninterrupted view of Plaintiff's vehicle

for "at least several seconds" prior to the collision and remembers seeing no other

vehicles on the interstate other than Plaintiff's vehicle and the 18-wheeler driver by

Valentino.[74]

  Grigg testified he saw the lights and the flashers of Defendant Smith's trailer

come on after the collision;[75] Defendant Smith did not have his lights and flashers

activated at the time of the collision.[76]  Grigg specifically testified as follows:

> Q: When you saw the [Plaintiff's vehicle] lift into the air, did you know at
> that point what, if anything, it had impacted?
>
> A: I had no idea what it had hit. I was like, "Holy cow, what in the world
> did that truck just hit?" I didn't have a clue. I was like – I was amazed at
> what I was seeing.
>
> Q: When did you first realize or come to know what the [Plaintiff's vehicle]
> may have hit?
>
> A: After the collision or whatever when the truck lifted up in the air, when
> it came back down and then it took a right-hand turn and went out
> through the woods, after that, I saw lights come on on an 18-wheeler.
>
> Q: What type of lights did you see come on?

---

[72] *Id.* at p. 49.
[73] *Id.* at p. 50.
[74] *Id.* at pp. 50-51.
[75] *Id.* at pp. 52-55.
[76] *Id.* at pp. 58; 112-114.

A: The taillights, and then I think the flashers came on shortly after that.

Q: When you say the taillights, are you referring to brake lights?

A: No. The – just the running lights. The brake lights, running lights, same thing, but he brakes were not applied at that point that I remember.

. . .

Q: What did you see after the taillights came on and describe the process of what you saw.

A: The accident took place. [Plaintiff's] truck went out. There was nothing. No lights whatsoever on [Defendant Smith's] truck that was on. I was still wondering what [Plaintiff] hit. Then I seen lights come on. The running lights or whatever, the taillights and stuff come on, then the flashers came on. And how long that took, I don't know. But that's what I remember seeing.

. . .

Q: When you saw the lights come on from the 18-wheeler involved in the collision, were you able to gauge or get any idea the speed that vehicle was traveling?

A: I was catching up with him very quickly. Very quickly.

Q: What, if any, conclusions did you draw from that?

A: Well, in my opinion, from me driving up that interstate highway that night, [Defendant Smith's] 18-wheeler was not on the road in front of me. He had not been traveling up the road in front of me for a couple of miles or anything else. If he had had his lights on, flashers on, I would have seen it. There's no way. The vision was just clear as it could be. There was very

light traffic. As I said, there was nobody in front of me but another 18-wheeler [Valentino], and that's – and [Plaintiff's vehicle].

My opinion is the 18 wheeler had been stopped on the side of the road. That's my opinion.[77]

. . .

"From what I remember seeing that night, [Defendant Smith's] 18 wheeler was not on the road in front of me going down the road. There was no lights on the 18 wheeler."[78]

On cross-examination, Grigg testified as follows:

Q: All right, sir. Now, just at the point in time when you saw the – what you described as the impact, when the [Plaintiff's] truck went up, at that point, you hadn't seen [Defendant Smith's] tractor-trailer; yes?

A: Right.

Q: So you don't know what the state of its lights were at the point of impact because you hadn't seen it at that point; true?

A: That's the reason I didn't see it.

Q: Is that true, sir?

A: That's true. But that's the reason I didn't see it.

Q: All right, sir. And so when you say the lights came on, what you're describing is that's the first time that you saw any lights?

A: That the lights were not on at the time of impact.

---

[77] *Id.* at pp. 52-58.
[78] *Id.* at p. 76.

. . .

Q: And to be precise with me, at the point that you saw the [Plaintiff's] truck go up, that's what you believe was the point of impact?

A: Yes, sir.

Q: At that point, you hadn't seen [Defendant Smith's] tractor trailer?

A: Absolutely.

Q: And at that point, you didn't see [Defendant Smith's] tractor-trailer?

A: No.

Q: So at the exact point of impact, you can't tell us what the state of the lights were on the tractor trailer because you hadn't seen the tractor trailer at that point. That's true, isn't it, sir?

A: The lights were off.

Q: Let me try again.

A: Okay, I know that answer you want me to give you.

Q: No, sir. I want the truth.

A: And that's what I'm giving you is the truth.

Q: And here's my question: At the time of the impact –

A: Yes.

Q: -- you didn't see [Defendant Smith's] tractor trailer.

A: No. I couldn't.

25

Q: And – you couldn't. And at the time of the impact, thus because you hadn't seen [Defendant Smith's] tractor trailer, at the immediate time of impact, you don't know what the state of its lights were . . . because you couldn't see it?

A: And I'm going to stick to my same story.

Q: Am I right?

A: I know what the state of the lights were. [Plaintiff's] truck lights were on.

Q: Am I right about that, sir?

A: No. You're trying to lead me.

Q: Am I right or not?

A: No, you're not right.[79]

Under Rule 602, "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony."[80]  A witness's lay opinion is admissible if it is "rationally based on the witness's perception"

---

[79]  *Id.* at pp. 112-115.
[80]  Fed. R. Evid. 602.

and "helpful to clearly understanding the witness's testimony or to determining a fact in issue."[81]

Grigg unquestionably testified he had a clear view of the interstate in front of him; he did not see Defendant Smith's tractor-trailer at all; he saw Plaintiff's truck fly up into the air, obviously having hit something; and then he saw the lights and flashers on Defendant Smith's tractor trailer appear. A rational opinion is Smith did not have his lights and flashers on before the collision; it is not "pure speculation," as Defendant contends. Grigg is not testifying as an expert or to matters beyond his personal knowledge, and his testimony is helpful for the jury to determine the cause of this accident. Accordingly, the Court finds this testimony admissible, to be properly attacked through cross examination.

## MOTIONS FOR PARTIAL SUMMARY JUDGMENT

Both Defendant Smith and Defendant National Casualty Company also seek summary judgment as to Plaintiff's claims for punitive damages and attorneys' fees.

### Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact

---

[81] Fed. R. Evid. 701.

and the movant is entitled to judgment as a matter of law."[82]   A genuine issue of material fact only exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."[83]   Thus, summary judgment must be granted if there is insufficient evidence for a reasonable jury to return a verdict for the nonmoving party or, in other words, if reasonable minds could not differ as to the verdict.[84]  In ruling on a motion for summary judgment, the Court must view the facts in the light most favorable to the party opposing the motion.[85]

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitle it to a judgment as a matter of law.[86]   If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material

---

[82] Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).
[83] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).
[84] *See id.* at 249-52.
[85] *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992).
[86] *Celotex Corp.*, 477 U.S. at 323 (internal quotation marks omitted).

fact.[87] This evidence must consist of more than mere conclusory allegations or legal conclusions.[88]

## Analysis

### <u>Punitive Damages</u>

Plaintiff contends the jury is entitled to consider the issue of punitive damages because, viewing the record in the light most favorable to Plaintiff, Defendant Smith was operating a tractor trailer on the interstate with a blown trailer tire, travelling below the minimum speed limit, at night, without rear trailer lights or emergency flashers activated, and without proper retro-reflective tape in violation of Federal Motor Carrier Safety Regulations, thus causing Plaintiff to collide into the back of Smith's tractor-trailer which resulted in Plaintiff's serious and permanent injuries. Even accepting the jury would find each of these contested facts in Plaintiff's favor, they do not rise to the level of willfully illegal behavior contemplated by the Georgia Code to justify punitive damages in this case.

Under Georgia law, "[p]unitive damages may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire

---

[87] *See* Fed. R. Civ. P. 56(e); *see also Celotex Corp.,* 477 U.S. at 324-26.
[88] *See Avirgan v. Hull,* 932 F.2d 1572, 1577 (11th Cir. 1991).

want of care which would raise the presumption of conscious indifference to consequences." [89] "Negligence, even gross negligence, is inadequate to support a punitive damages award."[90] "[S]omething more than the mere commission of a tort is always required for punitive damages. There must be circumstances of aggravation or outrage."[91]

In automobile collision cases, "punitive damages are not recoverable where the driver at fault simply violated a rule of the road."[92] For example, in *Coker v. Culter*,[93] the court rejected the plaintiff's claim for punitive damages where the defendant driver had been speeding, there was standing water on the road and visibility was poor, drug paraphernalia was found in the back of the driver's car, and the driver's blood alcohol level one hour after the accident was 0.03 percent. The court found that while this might be evidence of gross negligence, such evidence was not sufficient to meet the level required for punitive damages. Likewise, in *Bradford v. Xerox Corp.*,[94] the court affirmed summary judgment to the defendant on the plaintiff's claim for punitive damages where the evidence showed the defendant driver was speeding while reporting to his job, the

---

[89] O.C.G.A. § 51-12-5.1(b).
[90] *Brooks v. Gray*, 262 Ga. App. 232, 232 (2003) (citations omitted).
[91] *Id.* (citations omitted).
[92] *Miller v. Crumbley*, 249 Ga. App 403, 405 (2001) (citations omitted).
[93] 208 Ga. App. 651 (1993).
[94] 216 Ga. App. 83 (1995).

road was wet, and he crossed the highway median, striking plaintiff's vehicle and causing his injuries.[95] Georgia courts have not allowed plaintiffs to recover punitive damages for traffic violations unless the circumstances involving "aggravation and outrage."[96]

By contrast, to justify punitive damages, Georgia law requires "the collision result 'from a pattern or policy of dangerous driving, such as driving while intoxicated or speeding excessively.'" [97] For example, in *Langlois v. Wolford*, the court authorized punitive damages where the defendant driver left the scene of the accident, was intoxicated, and had a history of prior DUIs and traffic violations.[98] In *J.B. Hunt Transport, Inc. v. Bentley*,[99] the court found the jury was authorized to award punitive damages against both the defendant truck driver and defendant trucking company where the evidence showed the truck had been taken in for maintenance shortly before

---

[95] *See also Lindsey v. Clinch County Glass, Inc.*, 312 Ga. App. 534, 535-36 (2011) (no evidence driver, who was using his cell phone at the time of the collision, had a history of distraction-related accidents or other evidence that would show a pattern of dangerous driving or other aggravating circumstances so as to authorize punitive damages); *Brooks*, 262 Ga. App. at 233-34 (crossing the centerline and operating a vehicle without a proper license did not warrant imposition of punitive damages); *Miller*, 249 Ga. App. at 405 (no evidence of pattern or policy of dangerous driving where driver failed to keep a proper lookout and pled guilty to following too closely).

[96] *Mastec North Am. V. Wilson*, 325 Ga. App. 863, 866 (2014); *see also Currie v. Haney*, 183 Ga. App. 506, 506 (1987) (no punitive damages "in the absence of aggravating circumstances.").

[97] *Brooks*, 262 Ga. App. at 233 (quoting *Miller*, 249 Ga. App. at 405 and citing *Carter v. Spells*, 229 Ga. App. 441, 442 (1997)).

[98] 246 Ga. App. 209, 210 (2000).

[99] 207 Ga. App. 250 (1993).

the accident; several witnesses testified the truck was driving very erratically and swinging from lane to lane for at least ten to twenty miles before the accident; a Georgia Public Service Commission inspection found one-third of the logbook violations related to excessive hours driving; the defendant trucking company had destroyed the driver's log book, as well as pre-trip and post-trip inspection reports on the vehicle after it had initiated its own investigation; and the trucking company failed to produce the driver as a witness.

Similarly, in *Glenn McClendon Trucking Co. v. Williams*,[100] the court found the jury was authorized to consider punitive damages where the evidence revealed the trucking company ordered mechanics to make repairs on the trucks without giving them the appropriate tools to perform the task; while the truck was on the road its wheels began to smoke; although another truck driver alerted the defendant driver of the smoke, the defendant driver did not stop and continued to drive; the driver was told his brake drum was falling on his brake line, but before he could stop, the wheels separated from the truck and crashed into another car injuring a passenger.

---

[100]  183 Ga. App. 508 (1987).

Likewise, in *Fowler v. Smith*,[101] the Georgia Court of Appeals allowed the jury to consider punitive damages where the truck driver stopped his tractor trailer behind a disabled vehicle in the center lane of I-285 for 35 minutes; the driver did not place any warning devices in the highway; and although it was getting dark, the driver never activated the trailer's lights. In addition to the lack of lights and warning devices, the appellate court pointed out the truck driver had the opportunity to move the vehicle out of the center of the highway in the 35 minutes prior to the collision, but failed to do so.[102]

Here, Defendants' actions are not of the magnitude contemplated by Georgia's punitive damages statute. The situation here is more analogous to *Coker* and *Highsmith* than *Hunt*, *McClendon*, and *Fowler*. The record does not support an inference Defendant Smith caused the collision as a result of a "pattern or policy of dangerous driving." The Federal Motor Carrier Safety Regulations authorized Defendant Smith to enter the roadway with a blown tire. No evidence exists Defendant had any history of traffic violations or other evidence signifying a pattern of dangerous driving. Even if the jury finds he was travelling below the posted speed limit at night without his lights and

---

[101] 237 Ga. App. 841, 843 (1999).
[102] *Compare Highsmith v. Tractor Trailer Serv.*, Case No. 2:04-CV-164, 2005 WL 6032882, at *2 (N.D. Ga. Nov. 21, 2005) (no punitive damages where defendants stopped truck on side of highway when truck started overheating, exited truck, walked to front of truck and opened the hood to check for cause of the problem, and five minutes later plaintiffs' vehicle struck the rear corner of the trailer which remained partially in the roadway. The court determined these circumstances "far less egregious than those in *Fowler*.").

flashers on, there is no evidence he did so willfully or with "conscious indifference," which is defined in Georgia as "an intentional disregard of the rights of another, knowingly or willfully disregarding such rights."[103] Indeed, Defendant Smith highly disputes Plaintiff's contentions. The Georgia Code does not intend citizens to be slapped with punitive damages every time they violate the traffic rules. Even construed most favorably to Plaintiff, the facts of this case do not support an award of punitive damages. Defendant National Casualty Company is thus also freed from punitive liability.[104]

**Attorneys' Fees**

Defendants also contend they are entitled to summary judgment on Plaintiff's claim for attorneys' fees. Georgia law provides the "expenses of litigation generally shall not be allowed as a part of the damages; but where the plaintiff has specially pleaded and has made prayer therefore and where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow them."[105]  There is no basis to award attorneys' fees in this case under any prong of the statute.

---

[103] *Hutcherson v. Progressive Corp.*, 984 F.2d 1152, 1155 (11th Cir. 1993) (internal quotation marks and citation omitted).
[104] *See Lewis v. Smith Truck Leasing, Inc.*, 869 F. Supp. 947, 950 (S.D. Ga. 1994).
[105] O.C.G.A. § 13-6-11

First, there is no evidence Defendants acted in bad faith. "[T]he element of bad faith that will support a claim for expenses of litigation under O.C.G.A. § 13-6-11, must relate to the acts in the transaction itself prior to the litigation, not to the motive with which a party proceeds in the litigation." [106] "Bad faith requires more than 'bad judgment' or 'negligence,' rather the statute imports a 'dishonest purpose' or some 'moral obliquity' and implies 'conscious doing of wrong' and a 'breach of known duty through some motive of interest of ill will.'"[107] Here, the record evidence establishes Defendants were at most negligent or acted with bad judgment. "Proof of mere negligence or bad judgment is not proof that defendant acts out of some interested or sinister motive or consciously acted for some dishonest or improper purpose."[108] There is simply no competent evidence in the record to indicate Defendants acted in bad faith.

Moreover, Plaintiff cannot establish any genuine issue of material fact that Defendants were stubbornly litigious. "[S]tatutory recovery for stubborn litigiousness or causing unnecessary trouble and expense is authorized if there exists no bona fide

---

[106] *David G. Brown, P.E., Inc. v. Kent*, 274 Ga. 849, 850 (2002) (citation omitted).

[107] *Lewis v. D. Hays Trucking, Inc.*, 701 F. Supp. 2d 1300, 1312-13 (N.D. Ga. 2010) (quoting *Powell Co. v. McGarey Group, LLC*, 508 F. Supp. 2d 1202, 1219-20 (N.D. Ga. 2007) (Carnes, J.) (quoting *Vickers v. Motte*, 109 Ga. App. 615, 619-20 (1964)).

[108] *Highsmith v. Tractor Trailer serv.*, No. 2:04-CV-164WC, 2005 WL 6032882, at *9-10 (N.D. Ga. Nov. 21, 2005) (citing *Michaels v. Gordon*, 211 Ga. App. 470, 473 (1993)).

controversy or dispute regarding liability for the underlying cause of action."[109]  There is a clear bona fide dispute as to liability in this case, and thus attorneys' fees cannot be obtained under this prong.[110]  Finally, Plaintiff does not argue Defendants have caused him any unnecessary trouble and expense. Thus, Defendants are entitled to summary judgment on Plaintiff's claim for attorneys' fees.

## CONCLUSION

For the reasons explained above, Defendants' Motion to Exclude Plaintiff's Expert, Plaintiff's Motion to Strike Defendants' Reply Brief, and Defendant Smith's Motion In Limine to Exclude Certain Testimony of Freddie Grigg [Docs. 52, 67, and 63] are hereby **DENIED.** Defendants' Motions for Partial Summary Judgment as to Plaintiff's Claims for Punitive Damages and Attorneys' Fees [Docs. 36 and 39] are hereby **GRANTED**.

**SO ORDERED**, this 29th day of March, 2016.

S/ C. Ashley Royal
C. ASHLEY ROYAL, JUDGE
UNITED STATES DISTRICT COURT

---

[109] *Kent,* 247 Ga. at 850.
[110] *See Rigby v. Flue-Cured Tobacco Co-op.,* 327 Ga. App. 29, 42 (2014).

36